Opinion delivered June 19, 1886.

[No. 5087.]

## CLEM PIERCE v. THE STATE.

1. PRACTICE.—CHARGE OF THE COURT is not revisable for immaterial error unless the same was excepted to at the proper time.

2. SAME—SIMPLE ASSAULT—DEADLY WEAPON.—Whether or not the weapon used in committing an assault is in fact a deadly one is a matter of proof, and depends in some cases upon its use or the manner of its use. If the weapon (a pistol in this case) was used to strike with only, the assault would not be aggravated unless the evidence shows that when used in that manner it was a deadly weapon; or that, by means of such use, serious bodily injury was inflicted; or that the assault was committed

with premeditated design, and by the use of means calculated to inflict great bodily injury. The proof failing to establish the deadly character of the pistol when used as a weapon to strike with, the presumption obtains that it was not, as used, a deadly weapon; and the proof failing further to establish any of the other conditions enumerated, the issue of simple assault arises, and should have been submitted in charge to the jury. Failure to so charge, however, in the absence of exception or additional requested charge, is not ground for reversal. See the opinion *in extenso* on the question.

3. SAME—SELF DEFENSE.—See the statement of the case for evidence *held* to demand of the trial court a charge upon the law of self defense as embraced in Article 570 in connection with Article 571, and Articles 572 and 573 of the Penal Code. Note the charges upon the subject of self defense given in this case and *held* so far deficient as to require a reversal of the conviction notwithstanding the same were not excepted to at the proper time.

4. PRACTICE.—The law of the State recognizes no "reasonable rules or regulations" for the protection of a gambling house. Under the facts of this case the assault cannot be justified upon the plea that the accused had the right to eject the injured party from the gambling room.

APPEAL from the District Court of Grayson. Tried below before the Hon. R. Maltbie.

The conviction in this case was for an assault with intent to murder one Amos Reed, in Grayson county, Texas, on the fifteenth of February, 1885. A term of four years in the penitentiary was the penalty assessed against the appellant.

Amos Reed was the first witness for the State. He testified that, on Sunday morning, February 15, 1885, between the hours of eleven a. m. and twelve m., he went into the defendant's gaming house, which was situated up stairs in a building on West Houston street, in the city of Sherman. Witness, John Brown, Amos Saunders, and Mat Heath played one game of cards in the card room. The witness lost the only quarter of a dollar he had. After that game was played out, another game was made up between the same parties, except the witness. A number of persons besides those engaged in the game were then in the room. Witness could remember that Chuff Robinson, Jim Nicholson, and Bill Martin were among those present. When the game was made up, or at least when it was commenced to be played, some one of the party called on those in the house, and not engaged in the game, to leave the room, remarking in the same connection that the room, during the progress of a game, could be occupied only by those engaged in it. Several

of the parties not engaged in the game hesitated before complying with the request to leave the room, and Jim Brown, who was in the employ of the defendant, was requested by some one in the game to make those not engaged in the game leave the room. Brown requested those not present to leave the room, and all save witness and Bill Martin went out. Witness told Brown he wanted to stay in the room until the game was played, because Heath had promised, whether winning or losing, to give him a quarter as soon as the game was over. Such an arrangement did not meet the approval of the parties playing, and they called the defendant, who was then in another part of the house, to put witness out. Defendant thereupon requested all parties not engaged in the game to leave the room, remarking that the room was for the accommodation only of those playing. Witness refused to leave and told defendant that he was waiting to get a quarter that Heath had promised him at the conclusion of the game. Defendant insisted that witness should leave. Witness refused to go until he got the piece of money promised him. Defendant thereupon thrust the witness through the room door into the hall. When the witness turned facing the door he saw the defendant standing in the door, with one hand against it, as if to prevent the witness going into the room again. Defendant remarked that he would mash the witness's mouth. Witness told him to do it, and complained to defendant that he was not being treated right. Defendant thereupon thrust his hand into his hip pocket, drew a pistol, raised his left hand before his face, and discharged his pistol under his left arm. Witness was knocked senseless to the floor just outside the gambling room door. The ball struck the witness on the right side of the face, opposite the lower part of the nose, ranged backwards and lodged about the lower part of the right ear, where it still is. Witness expected to die, and was confined to his bed, in the care of Doctor Gunby, between six weeks and two months. Witness had but recently recovered sufficiently from an ax cut on the foot to walk without crutches, and, when shot, was still lame. The defendant was greatly his superior in strength and size.

Cross-examined, the witness testified that he did not thrust his hand into his pocket when he turned around at the door, when pushed out by the defendant. He had no knife, nor did he draw one on the defendant. He did not strike at the defendant with his hand, knife, or any thing else. Witness did nothing when put out of the room, except to turn around, and, when

defendant threatened to mash his mouth, to tell him to do it then; and that he, defendant, was not treating him, witness, right. The defendant did not, nor did he have any occasion, to ward off any blows struck by the witness. Witness made no effort to strike the defendant. Witness lost his only twenty-five cents on the first game, and was waiting to be staked for the third game by Mat Heath. Defendant requested witness to leave the room several times before putting him out. Witness had often visited the defendant's gaming house before this trouble, and had participated in many games played therein. Witness knew Major Boswell. He did not tell Major Boswell, at Levy's corner, in Sherman, about a week before this trouble, that he had been long losing at the game played at the defendant's house, and that neither the defendant nor other parties would help him when he was "broke," and that the next time the defendant, or any body else, fooled with him, witness, in that house, he intended to cut his guts out.

John Brown testified, for the State, that he was in the first game played in defendant's house, before the difficulty between defendant and Amos Reed occurred. The game was "six up and seven out" with cards, the stake being twenty-five cents each. Witness, Amos Reed, Amos Saunders, and Mat Heath, were the parties playing. Witness did not know which of the four won the "pot," but knew that he and Reed both lost. At the conclusion of that game, another game was made up, and a number of parties, non-players, had collected in the room. Some one in the game requested those not playing in the game to leave the room. Jim Brown, who was working for the defendant, was then requested to put out all parties not interested in the game. A number of persons, including Amos Reed, refused to leave the room. Defendant was then called into the room, and requested to clear it of all persons not playing. Witness and several others went out. Reed, who was standing in the corner of the room, said that he intended to have a piece of money before he left. Defendant and other parties made several appeals to Reed to leave the room. Reed as often replied that he wanted a piece of money before he left, and that Mat Heath had promised to stake him at the end of the game. It was about this time that witness left the room, and walked down the hall to light his pipe. Having lit his pipe the witness walked back up the hall, and at the door of the gaming room met Reed coming out, pursued by the defendant. When he reached the hall Reed turned around,

facing the defendant. Some words passed between them, when defendant said that he would mash Reed's mouth. Defendant then thrust his right hand into his hip pocket and caught the handle of his pistol. The pistol appeared to catch on the lining of the pocket. He succeeded, presently, in disengaging it, drew it, placed his left arm in front of his face and breast, leveled the pistol on Reed, and fired, the ball striking Reed on the right side of the nose. Reed fell senseless to the floor, and witness and others, if not all of the negroes, ran down stairs. Witness did not see what became of the defendant.

Cross-examined, the witness testified that Bill Martin was one of the persons in the room who did not take part in the game. Nicholson and others went out with the defendant, when requested to leave. Witness heard the noise or disturbance in the room while he was lighting his pipe. Reed had no knife that the witness saw, nor did he strike or attempt to strike the defendant before the shot was fired. Defendant fired from the side of the door way next to the gaming room. Defendant's left arm was resting on the door facing just before the shot was fired. Reed was making no demonstration towards the defendant when the shot was fired.

M. O. Callahan, the keeper of the Grayson county jail, testified, for the State, that he and ex-sheriff Everhart went in search of the defendant just after the shooting. They found him under a platform in the rear of the building in which the shooting occurred. He said that he hid under the platform because he was afraid of being mobbed. Some one handed the witness the pistol in evidence, as the defendant's pistol. That weapon was a self cocking five shooter bull dog pistol. One chamber was empty when the witness received it. The State rested.

John Nicholson was the first witness for the defendant. He testified that he was in the defendant's gaming room just before the difficulty between Reed and defendant occurred. He heard Reed refuse to leave the room when requested, and heard some one of the parties engaged in the game appeal to Jim Brown to clear the room of non-players. Witness and others passed out of the room when Brown made the request for them to do so. Defendant was sent for when Reed refused to leave the room. Witness heard defendant ask all not engaged in the game to leave the room. He heard Reed refuse to leave, and when he reached the billiard hall he heard the noise or scuffling attending the defendant's effort to expel Reed. He also heard the re-

port of the pistol, but did not see the pistol fired. Defendant appealed to Reed as many as a half a dozen times to leave the room. Reed as often replied that he would not leave until he got a piece of money. Witness did not know what became of the defendant after the shot was fired.

Bill Martin testified, for the defense, that he stepped into the defendant's gaming room a few moments before the shooting occurred. He found Heath, Saunders, Robinson, and some one else, engaged in a game of cards, and Reed, Nicholson, and others, standing around. Some one of the parties playing in the game asked Jim Brown, the defendant's employe, to ask all persons not playing to leave the room. Brown did so, and Reed refused to go. Defendant was then sent for to clear the room. He asked Reed as many as a dozen times to leave the room, and Reed as often refused to leave. Defendant told Reed that the room was for the use of players only. Reed stood in the north corner of the room, refusing to go out, with his hand in his pocket. Defendant finally put his hand on Reed's shoulder and pushed him across the room to, and out of the door, into the hall. When he got into the hall Reed turned, facing the defendant, and drew a knife from his pocket. He then advanced upon the defendant, and struck at him two or three times with the knife. Defendant retreated backwards, while Reed advanced and struck at him. Finally he drew his pistol, raised it in a striking attitude, and told Reed that he would knock his head off. In an effort to club Reed with the pistol, the pistol was discharged. Reed was striking at the defendant with his knife when the shot was fired. All of the negroes, save witness and Chuff Robinson, fled from the house. Witness afterwards saw Reed's barlow knife lying on the floor, but did not know what became of it. The pistol was projected from the defendant's hand when the shot was fired, and fell to the floor near the wall. Witness did not see John Brown standing in the hall at the time of the shooting.

Cross-examined, the witness testified that he and the defendant were not friends. They had not been on speaking terms for two years prior to the shooting. Their trouble grew out of a case tried in the Federal court, at Dallas. Witness had discussed this case, and his knowledge of the facts, with no one except Bill Douglass, and not with him since the day of the shooting. Witness at no time told the State's attorney that he knew nothing of the case. On the contrary, he refused to talk to the

State's attorney at all about the case. Defendant's attorneys sent several times for the witness to call on them at their office, but witness refused to go.

Amos Saunders testified, for the defense, substantially as did the previous witness, as to the two games of cards, and the repeated efforts of Brown and the defendant to get Reed to leave the room. He stated in addition, that, just before the last time defendant asked Reed to leave, he, witness, told Reed to go, and to wait for him outside, when he, witness, would give him a quarter. Reed refused. Defendant then pushed him out of the door. When he got into the hall Reed turned, drew his hand from his pocket, and struck at defendant two or three times. Defendant held up his left arm to ward off the blows, drew his pistol, and struck at Reed with it. The pistol was discharged, and "flew" out of the defendant's hands. Witness saw no knife in the hand of Reed.

Cross-examined, the witness testified that he played at cards some times, but was not a professional gambler. He was a black smith by trade, and had worked for Fowler for eight or ten years. Witness did not lose his job. He was not working at present, but could get work any time he pleased. The witness had no interest in the defendant's gambling house. Reed did not advance upon defendant, nor did the defendant retreat. Defendant had not kept a gambling house since the shooting.

Mat Heath testified, for the defendant, substantially as did the witness Amos Saunders.

Major Boswell testified, for the defense, that he had a conversation with Reed, a few days before the shooting, at Levy's corner, in the city of Sherman, in the course of which Reed said that he had lost all of his money in defendant's house; that it looked like he never could win again; that neither defendant nor others would let him have any money after losing, and that the first time the defendant or any other son-of-a-b—h in his house bothered him, he, Reed, would cut his guts out.

The charges of the court referred to in the third head note of this report, read as follows:

"Tenth. * * * * But if you believe the said Reed either assaulted said Pierce, or made any hostile demonstration towards him, and that said Pierce, in order to repel such attack, struck said Reed with said pistol, and that said pistol was not a deadly weapon in the mode and manner of its use, and that said

pistol was accordingly discharged and wounded said Reed, you will find the defendant not guilty.

"Eleventh. If you believe from the evidence that by reason of some act done or word spoken, coupled with the acts of the said Reed, it reasonably appeared to the said Pierce that the said Reed was then about to take his life, or to inflict serious bodily injury upon him, the said Pierce, then, under such circumstances, the defendant would have the right to take the life of the said Reed; and if you believe that the above state of facts existed, you will find the defendant not guilty. It is not necessary in order for this defendant to justify, for him to have been in actual danger; but it would be sufficient if you believe from the evidence that the defendant really believed that he was in real danger; and in passing upon the evidence, you will view it from the standpoint of the defendant, and find the facts as you believe they appeared to him."

The motion for new trial raised the questions discussed in the opinion.

*J. D. Woods* and *A. C. Turner,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. Four distinct issues are fairly presented by the evidence. 1. An assault with intent to murder. 2. An aggravated assault. 3. A simple assault; and 4, self defense. The first issue was sufficiently and correctly submitted to the jury by the charge of the court.

As to the second issue, whilst the charge of the court in relation thereto is not literally correct, and is perhaps somewhat awkwardly expressed, still we think it is substantially correct, and there being no exceptions thereto, taken at the time of the trial, we are not called upon to revise immaterial errors therein.

As to the third issue, there was no charge whatever. There is evidence tending to show that defendant was striking, or attempting to strike, the injured party with a pistol, when the pistol was accidentally discharged, whereby the injury complained of was inflicted. If the pistol was used by the defendant to strike with only, the assault would not be aggravated, unless the evidence showed that when used in that manner it was a deadly weapon; or that, by means of such use serious bodily injury had been inflicted; or that the assault was committed with pre-

meditated design, and by the use of means calculated to inflict great bodily injury. (Penal Code, Art. 496.) There is no proof establishing either of these conditions. There is no proof that the pistol was a deadly weapon when used to strike with, and in the absence of such proof it would be presumed that it was not that character of weapon when so used. When a gun or pistol is used to strike with, it is not necessarily a deadly weapon, but would be such, or not, according to its size, or the manner of using it, and its character is usually to be determined by the jury. (Hunt v. The State, 6 Texas Ct. App., 663; Wilson v. The State, 15 Texas Ct. App., 150.) If, therefore, the pistol when used to strike with was not a deadly weapon, and while being so used was accidentally discharged, whereby serious bodily injury was inflicted, and if the assault was not committed with premeditated design and by the use of means calculated to inflict serious bodily injury, and if no serious bodily injury was inflicted by striking with the pistol, then such assault would be of no higher grade than a simple assault; for "no act done by accident is an offense except in certain cases specially provided for, where there has been a degree of carelessness or negligence which the law regards as criminal" (Penal Code, Art. 44), as in the case of negligent homicide. (Penal Code, Art. 578, *et seq.*)

We think the court should have submitted the issue of simple assault to the jury under the facts of this case, but this omission in the charge not having been excepted to, and no additional charge presenting the issue having been requested by the defendant, we would not for this error disturb the conviction, because it does not appear to us probable that the defendant was injured or prejudiced by the failure of the court to submit said issue.

As to the fourth issue, the court charged upon it, but not fully and accurately. The evidence demanded a charge upon the law of self defense as embraced in Articles 570 and 572 of the Penal Code; and in connection with Article 570, Article 571 should have been given in charge. (Kendall v. The State, 8 Texas Ct. App., 569; Foster v. The State, 11 Texas Ct. App., 105; Jones v. The State, 17 Texas Ct. App., 602; Stevenson v. The State, Id., 618; Risby v. The State, Id., 518.) Again, the court omitted to give in charge Article 573 of the Penal Code, which was a material error. (Bell v. The State, 17 Texas Ct. App., 550; Arto v. The State, 19 Texas Ct. App., 126.) Upon this issue of self defense we think the charge of the court is materially defective, and its

deficiency is of that character which is fatal to the conviction, although not excepted to at the time of the trial. Because of the error upon the issue of self defense, the judgment will be reversed and the cause remanded.

As to the right of the defendant to forcibly eject the injured party from the gambling room, we are of the opinion that he had no such right under the facts of this case, and cannot justify his assault upon that plea. The law knows no reasonable rules or regulations for the protection of a gambling room, and games played in violation of law.

In all other respects except those above metioned, we think the conviction is a legal one, but for the reason before named the judgment is reversed and the cause remanded.

*Reversed and remanded.*