### W. M. TATUM v. THE STATE.

No. 2380. Decided January 29, 1902.

**Murder—Evidence.**

On a trial for murder, where the defense was that deceased had committed rape upon defendant's wife, and where the State had proved that deceased was impotent on account of age and decrepitude, and incapable of committing rape, it was not error to exclude, as rebutting the State's theory, evidence to the effect that about two years before deceased had proposd marriage to a female witness; and that shortly before the homicide he had told a witness he (deceased) wanted to get a woman to sleep with.

Appeal from the District Court of Hill. Tried below before Hon. W. Poindexter.

Appea.. from a conviction for murder in the second degree; penalty, thirty years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of T. E. Tomerlin, on the 1st day of June, 1901, by shooting him with a gun. The substantial facts proved upon the trial were: The homicide occurred about daybreak on Saturday morning, June 1, 1901, at the horse lot on the premises where appellant and deceased both resided. Appellant and deceased resided in the same house, which consisted of two front rooms and two shed rooms. Appellant, his wife, and three little children occupied one front room and the shed room behind it as a kitchen, and kept house therein, and deceased and his sons Craig and Neil Tomerlin occupied the other front room and the shed room behind it, which they used as their kitchen; thus making two separate families keeping house separately in separate parts of the same house. Appellant and deceased each cultivated separately about fifty acres of land on the same farm in Hill County, Texas. Appellant and deceased moved to this place from some other county some time in January, 1901, appellant having moved to Hill County from Ellis County. Appellant was thirty-five years of age, and it was admitted by the State that up to the time of the homicide appellant had a good reputation for being a man of peaceable, inoffensive, law-abiding character in the neighborhoods where he lived. The killing was done with a shotgun, and two shots were fired in quick succession. The deceased fell about where he was shot, in the horse lot, near the barn. The barn was in the northeast part of the lot.

E. P. Whitson, for the State, testified that he lived about one-half mile southwest .of defendant's house. On Wednesday before the .homicide appellant came to his house and wanted to borrow a gun from him. Witness told him he had no gun, but his brother-in-law, Arch Stanley, had a gun and probably would loan it to him. Appellant told witness he wanted the gun to kill old man Tomerlin with; that he would borrow it from Arch Stanley, but would tell him that he wanted the gun to kill a dog with, or else Arch Stanley would not loan it to him. "Appellant told me that the old man Tomerlin was fussy and he could not get along with him any longer. Appellant also told me there was something else he could tell me."

T. Martin, for the State, testified: "I lived about 300 yards from Arch Stanley's and about one-quarter of a mile from defendant's house. On Friday morning about sunup, before the killing which occurred on Saturday morning, appellant came to my house and asked me if I had any shells. He said he wanted to go bird hunting.. I had some No. 6 shells, and I loaned him seven shells."

J. F. Bateman, for the State, testified: "I lived about four or five hundred yards north of defendant's residence. I heard of the killing about daylight Saturday morning. Deceased's son came to my house and told me of it and I went with him to the place of the homicide. When I got to the deceased he was dead. He was lying in the northeast part of the horse lot, near the barn. He was shot with a great many

shots in the right breast over and around the right nipple; with some other scattering shot in front; there were also some shot in his back." '

Cross-examined, this witness, for defendant, testified that "on Monday morning, about half an hour by sun, deceased came to my house and borrowed from me a plow and took the plow off home with him."

Arch Stanley, for the State, testified: "About dark on Wednesday before the homicide appellant came to my house and wanted to borrow my gun; said he wanted to kill a dog; that he would rather have a pistol, as it would not make so much noise. I had a shotgun. I did not loan him the gun this time. On Friday morning, directly after sunup, appellant came to my house again and wanted to borrow my gun; I loaned him the gun. I told him I didn't have any shells except No. 8 shells, and he said they were not large enough, and I told him T. Martin might have shells, and he said he would go up to T. Martin's and get some shells; that he wanted larger shot than No. 8."

The State having rested, appellant introduced his wife, Mrs. Ida Tatum, who testified in his behalf: "I am the wife of the defendant and the daughter of the deceased. I am 22 years of age, and was married about five years ago and have three children, the oldest about four years of age. I and my husband, and children kept house in one part of the house, and my father and my two brothers, Craig and Neil Tomerlin, kept house in the other part of the house. My father and husband farmed separately and kept house separately. My husband slept in a bed with the oldest child in the corner of the front room away from the shed room, and I and my two youngest children and a little niece of mine slept in the other corner of the front room next to the shed room. Some time after I was married I and my husband lived with deceased for about six weeks. Deceased and defendant moved to Hill County and rented land in the month of January, 1901. On Monday morning before the homicide deceased went up to Mr. J. F. Bateman's and borrowed a plow and brought it back home. This was about an hour by sun. My husband and two brothers Craig and Neil were all off somewhere in the field at work. My father came into my room and asked me to do indecently with him. I refused to do so, and he went out of the room. When he asked me to do so with him and I refused he told me not to tell it, and that if I did tell it he would kill my husband. On that night, after I went to bed, I told defendant. On Friday night, or rather Saturday morning about three-quarters of an hour before day, I had occasion to go out in the yard. I went out of the back door, that is, the shed room door, when my father caught me, and with a knife he threatened me and forced me to submit to him. He caught hold of me and threw me down on the ground and told me not to say anything or he would kill me. When deceased got through with me he went back into the house, into his part of it, and I went back into my room, but did not go to bed any more. I sat on the side of my bed and was crying, when my husband woke up and asked me what was the matter, and I told

him my father had raped me. I told him about it, and he got up and dressed himself and went out of the front door and shot. I did not see the shooting. The day before my father cursed and abused me, and my husband did not resent it. When I told defendant my father had raped me he seemed troubled."

Cross-examined: "When I came into the house after being raped I did not wake defendant up and did not tell him immediately. I waited until he woke up and asked me, and then I told him. My father had threatened to kill us both if I told defendant, and I knew my father's disposition so well. I did not scream or say anything when my father forced me out in the yard. He had a knife and threatened to kill me if I said a word."

Defendant having rested here, the State introduced Tom Tomerlin, who in substance testified that his father, T. E. Tomerlin, the deceased, was an old, gray, feeble, sickly man, weighing about 125 pounds; that he was lame in one leg and was something like 68 years of age.

J. B. Moore testified substantially that deceased was an old man about 70 years of age, weight about 100 to 125 pounds, frail, and limping a little in one leg. J. F. Bateman testified about same as did witness Moore.

Sheriff W. I. Satterfield testified, substantially, that a few days after the homicide he took defendant up to the town of Itasca before the justice of the peace for an examining trial, and that on that day at dinner time defendant's wife was with him in a restaurant for some ten of fifteen minutes, and talked with him. Defendant was at the time under arrest, but the sheriff did not hear what they were talking about; that they were some little distance from him, and he did not pay much attention to them. That is, as to what they were talking about. The State having rested here, defendant introduced W. I. Satterfield, Sr., and J. D. Maxwell, who testified substantially that deceased was not lame; was a short, heavy-set man, weighing about 140 to 150 pounds; that his reputation for being a leacherous, whore-mongering man was bad; that he was about 62 years of age.

Mrs. Lucy Reynolds, Mrs. Lillie Few, and Mrs. John Few testified to the good reputation of defendant's wife, Mrs. Ida Tatum, for truth and veracity.

The court excluded testimony to prove that deceased had said, in the spring of 1901, he wanted to get a woman to sleep with. Also excluded the testimony of Annie Patrick, to the effect that about two years before the time of her testifying deceased tried several times to get her to marry him and asked her to marry him. This witness testified that she was 14 years of age at the time she was testifying.

*Ivy & Scruggs* and *Douglass & Shurtleff,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was charged with the murder of his father-in-law, and upon trial was convicted, and his punishment assessed at thirty years confinement in the penitentiary.

Bills of exception numbers 1 and 2 complain that the court erred in excluding evidence to the effect that deceased had told witness that he wanted to get a woman to sleep with, shortly before the homicide. Bill number 3 is to the exclusion of the testimony of Anna Patrick that, about two years before, deceased proposed marriage to witness. Appellant's contention is that this would tend to rebut the theory of the State that, on account of the age or decrepitude of deceased, he was impotent, and incapable of committing the crime of rape upon the wife of appellant, which, according to the theory of appellant, was the cause of the homicide. This evidence was inadmissible. The court permitted appellant to prove the general reputation for lasciviousness of deceased, and this was all appellant could legally contend for. Underh. Crim. Ev., sec. 325; Jones v. State, 38 Texas Crim. App., 88. Under the facts, appellant was guilty of murder in the first degree. At least, the jury would have been warranted in so finding. He deliberately planned and prepared himself for and took the life of his father-in-law, stating he did so because he was tired of him. The jury were amply warranted in finding the verdict they did. The judgment is affirmed.

*Affirmed.*