### J. F. MERRITT v. THE STATE.

No. 5464.    Decided June 27, 1919.

**1.—Manslaughter—Negligent Homicide—Charge of Court.**

Where, upon trial of murder and a conviction of manslaughter, it appeared that defendant was tried for shooting and killing the wife of the party with whom he had a difficulty, during which a pistol was discharged which killed the said wife, and there was no evidence from which knowledge of her presence at the immediate place where the difficulty occurred could be imputed to the defendant, the court's charge making the guilt of defendant depend upon whether the evidence showed it to be apparent to the defendant at the time that deceased was in danger of being killed, was error, and the charge should not have been given.

**2.—Same—Self-Defense—Accident—Charge of Court.**

Where, upon trial of murder, and a conviction of manslaughter, the defendant was charged with intentionally shooting and killing the wife of the party with whom he had a difficulty at the time, and there was evidence on self-defense as well as accidental shooting, the court's charge on self-defense was erroneous in requiring the jury to believe that the discharge of the pistol was accidental before defendant's right of self-defense existed.

**3.—Same—Pistol—Deadly Weapon—Adequate Cause—Intent—Assault and Battery.**

Where, upon trial of murder and a conviction of manslaughter, it appeared from the evidence that the pistol of defendant was used by him as a bludgeon against the party who's wife was either accidentally or intentionally killed at the time defendant struck at her husband, and that the blow he made was hardly felt, and it was not shown that the pistol thus used was per se a deadly weapon, the court should have charged the jury the provisions of Article 1149 P. C., with reference to the grades of assault and battery.

**4.—Same—Manslaughter—Insufficiency of the Evidence.**

Where, upon trial of murder and a conviction of manslaughter, the State claimed that in a difficulty between the defendant and the husband of the deceased, the defendant in striking at his adversary with a pistol intentionally discharged it and killed the latter's wife, and the defendant denied the presence of the deceased at the time of difficulty and claimed the killing purely accidental, as far as he was concerned, and the evidence appearing in the record on appeal failed to make out the State's case and was insufficient to sustain the conviction for manslaughter, the judgment must be reversed and the cause remanded.

Appeal from the Criminal District Court of Bowie. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Mahaffey, Keeney & Dalby* for appellant.—On question of court's charge on manslaughter: Pierce v. State, 21 Texas Crim. App., 540; Stephenson v. State, 33 Texas Crim. App., 162.

On question of negligent homicide: McPeak v. State. 80 Texas Crim. Rep., 50, 187 S. W. Rep., 754.

On question of court's failure to charge on the different degrees of assault and battery; Johnson v. State, 42 Texas Crim. Rep., 377; Lozano v. State, 202 S. W. Rep., 510; Bean v. State, 25 Texas Crim. App. 346; Carr v. State, 80 Texas Crim Rep., 465. 190 S. W. Rep., 727, and cases above cited.

*E. A. Berry,* Assistant Attorney General, for the State.

LATTIMORE, JUDGE.—In this case appellant was convicted in the Criminal District Court of Bowie County of the offense of manslaughter, and his punishment fixed at two years confinement in the penitentiary.

Enough of the facts will be stated in the opinion. The eighth paragraph of the court's charge, wherein he submits negligent homicide, makes the guilt of appellant depend on whether the evidence showed it to be apparent to the appellant at the time he struck at the witness Johnson, that deceased was in danger of being killed. A charge should not be given without, at least, some evidence to support it, or raise the issue therein submitted. Only two eyewitnesses testified to the facts immediately attendant upon his homicide— Johnson, the husband of deceased, and the appellant. Appellant denied *in toto* the testimony of Johnson, and denied the presence of deceased at the time Johnson says the encounter between the men took place, and Johnson says he did not know where his wife was at said time; that he had not seen her since he came into the room. No other fact was testified to by either of them from which knowledge of her presence in the room could be imputed to appellant, unless it be the fact that she was shot. Johnson says appellant was looking at him when he struck with the pistol and it fired. Under this state of the record the portion of the charge above mentioned on negligent homicide should not have been given. This is said in view of the possibility of another trial.

The court's charge on self-defense was erroneous. If appellant was placed in such position by the circumstances, as gave him the legal right to defend against an unlawful attack on the part of Johnson, causing him to have a reasonable expectation or fear of death or serious bodily injury, his right of self-defense would

inure regardless of whether the discharge of the pistol was accidental or otherwise. The court's charge was erroneous in requiring the jury to believe that such discharge was accidental before appellant's right of self-defense existed.

A pistol used as a bludgeon is not *per se* a deadly weapon. Branch's Ann. P. C., Sec. 1587, and authorities cited. Under the testimony of the witness Johnson, appellant struck at him with a pistol used as a weapon to strike with. Johnson says he dodged foreward and to the left as appellant made this blow, and that either the pistol or the hand of appellant struck his shoulder; that it was such a light blow he hardly felt it; that when this blow was struck the pistol fired; that immediately preceding said blow by appellant, he had stuck appellant with his fist as hard as he could, staggering him back a step or two, and that as appellant straightened he came over with said blow with the pistol. The court had charged the jury under the head of adequate cause to produce sudden passion. that an assault and battery by Johnson upon appellant was adequate cause. Bearing these facts in mind, we call attention to the provisions of Article 1149 of our Penal Code, which is as follows:

"Where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide, unless it appear that there was an intention to kill, but the party from whose act the death resulted may be prosecuted for and convicted of any grade of assault and battery."

The provisions of this article should have been substantially given in charge to the jury, coupled with definitions of various grades of assault.

This court feels that it is in duty bound to frankly say that there exists a serious doubt in the mind of the court as to the sufficiency of the evidence to show appellant's guilt. Johnson and appellant were friends, and lived about four miles apart, Johnson being a farmer, living with his wife and child, and appellant being a saw-mill man, living in the village of Maud, in Bowie County, and there had been numbers of business transactions between the men, all of which appeared to be pleasant, and Johnson was selling some logs to appellant at the time of the homicide. Appellant had gone to Johnson's house, getting there about 11:30 in the morning, as he says, to see Johnson with regard to said logs, and finding out that Johnson was away but would be back at noon, he went into the house and took a seat by the fire.

Johnson testified that he came home about noon and found his back door locked, and went to the front door and found it locked, but on trying the door again it was opened by his wife, who seemed to be a little agitated and her voice trembly and said, "I am glad you came;" that he walked into the room which was oc-

cupied by him and his wife as a dining room, and laid some fresh meat given him by a neighbor, on the dining table; that he looked through the door into the bed room to the north and saw appellant in the act of getting up with a pistol in his left hand; that he at once went to an incubator in the southwest corner of the dining room and got a 45-Army Colt's pistol of his own with which he advanced to the door leading into the bed room; that just as he got to the door he met appellant still holding his pistol in his left hand and down by his side; that he covered appellant with his pistol, and appellant said, "Don't—I haven't done anythng," or "I ain't going to do anything;" that he lowered his pistol, and as he was lowering it appellant suddenly jerked it out of his hand; that he immediately struck appellant with his right fist as hard as he could, staggering him back; that as appellant straightened he came over with Johnson's pistol and struck at Johnson; that he, Johnson, dodged to the left and forward, and was struck on the shoulder a light blow, which he hardly felt, either by appellant's hand or the pistol, which fired simultaneously; that he straingtened up, and seeing appellant meant him harm he ordered him out of his house; that appellant said he would go but wanted his hat; that he Johnson walked into the bed room and picked up appellant's hat lying by the bed and came out and gave it to him, and appellant walked out on the porch where he stopped and accused Johnson of having killed his own wife; that he went out on the porch and his wife was lying a short distance north of the steps; that he asked appellant to help him bring her in the house and appellant refused; that appellant got in his car, carrying both pistols, went on off up to Griffin's, who was Johnson's nearest neighbor, and that after washing the blood from the face and neck and hair of his wife, and getting her body into the house, he went on up to Griffin's meeting appellant and Griffin on the way.

For himself appellant testified that after taking his seat by the fire, that he talked to Mrs. Johnson for a short time, and she excused herself and went on about her work; that he knew of no trouble until Johnson came; that he heard a woman's voice say, "Oh! my God, George; don't do that," and immediately heard a pistol shot; that he got up and went to the door leading out of the bed room, and as he stepped through it Johnson struck at him there beside the door with a pistol; that he ducked down and was struck on the back of the head by the pistol, cutting quite a gash; that he grappled with Johnson, and somehow took the pistol away from him, and that he then got his hat and went out, and when he got on the porch he saw Mrs. Johnson lying in the yard north of the steps, and said to Johnson, "You have killed your wife;" that he, appellant, refused to put his hands on the body, and went out and got in his car and started up the lane; that he had gone a little distance when

he overtook Mr. Ivey to whom he told of the occurrence in the house, and that Johnson killed his wife. He showed Ivey the cut place in the back of his head, and tried to get Ivey to go to Johnson's assistance, but he would not do it; that he had a pistol of his own stuck down behind the cushion of his car which he carried because of some parties of whom he was afraid, and that when he got to Griffin's and was leaving his car to go into the premises, fearing that Johnson would come along and not knowing what might happen, he took the pistol out of his car and put it under some leaves; he then went and saw Griffin and told him the details of what had taken place at Johnson's house; that Johnson had struck him in the head, and had killed his wife, and insisted on Griffin going down to Johnson's house; that he gave to Griffin Johnson's pistol; that they started toward Johnson's house, and as they went by appellant's car he went to the leaves and picked up his pistol and put it some where about his person; that as they went toward Johnson's house they saw Johnson coming raving and cursing and slinging his hands, and that when he came near he accused him, appellant, of having killed his wife; that he said to Johnson, "You are a damn liar, you killed her yourself;" that he left Johnson and Griffin going down toward Johnson's home, got in his car and went on to the little village of Maud where he had the doctor to dress the cut place in the back of his head; that he had some scabbed places on his face from some previous injury which some how in the struggle with Johnson were hurt and bled.

C. C. Ivey testified that he was on his horse and in the road approaching Johnson's house; that he noticed a car standing in the lane, and just as he stopped his horse at the house he heard a sort of murmur or scream, sounding more like a woman than a man, and then heard a report which he thought was the explosion of a tire on the car; that he looked at the car and seeing nothing wrong, looked toward the house and saw a woman standing in the yard with blood on her breast; that he was horrified and put his hand over his eyes, and looked again at once and she had fallen; that he saw a man's form which seemed to him to be in the door leading from the porch into the house, but he could not tell who it was. Not wishing to get mixed up in the matter, he turned his horse and started away, looking back now and then; that he presently saw appellant come out of the house, get in his car and come on up the road; that when appellant overtook him he asked what had occurred, and appellant told him Johnson had killed his wife, and had hit him in the back of the head. Ivey said he saw a drop of blood on appellant's nose and saw blood on the back of his head and dripping from the cut which he saw back there. After talking with appellant a few minutes, Ivey said he went on toward Maud and appellant went on up to Griffin's.

Sam Griffin testified that he was killing hogs the day of the homicide, and Johnson came by his house along about noon and he gave him some fresh meat. This witness lived northeast of Johnson's home a few hundred yards. The first he knew of the difficulty he heard appellant calling to him, and he went out to where he was and appellant told him about going to Johnson's house to see him, and about his going in and sitting by the fire, and hearing Mrs. Johnson beg her husband not to do that, and about the pistol shot, and the assault made on him by Johnson, and of his taking the pistol away from Johnson, and gave to witness Griffin said pistol, and witness saw blood on appellant in three places, two of which appeared to be scabs pulled or knocked from old hurts, and the third of which was a cut in the back of the head from which blood was dripping down upon appellant's collar and coat; that when appellant gave him Johnson's pistol it was half cocked, and that he left the hammer down, and subsequently gave the pistol to the constable in the exact condition that it was when he got it from appellant. Griffin said appellant insisted on him going down to Johnson's house, but that he did not want to, but finally agreed to go and they started; that when they got near appellant's car he went out to some leaves but he did not know what he got. That Johnson was coming up the road raving and slinging his hands and hollering, and calling appellant vile names, and when they met he said. "Oh, Sam, he killed my wife;" that appellant said, "You are a God damned liar, I never done any such thing;" that he told appellant to go on, and he went and got in his car and went off. He went down with Johnson to his house and found Mrs. Johnson dead. A physician was a witness in the case, and testified that he dressed appellant's head that afternoon; that he had a cut in the back of his head about an inch or an inch and a half long; that he also examined the body of Mrs. Johnson and found she was shot in the left breast and the region of the heart, and that a person shot as she was could go only a few steps after being shot. This witness said the bullet entered near the breast bone.

Mrs. Stinson testified that she dressed the body of Mrs. Johnson, and that in addition to the hole in the front, there was a larger hole near the backbone under the left shoulder.

The constable of the precinct testified that he got a pistol, which was exhibited in evidence, from the witness Griffin, and that it was a six-shooter and had one freshly exploded shell ,and five loads in it at the time he received it from Griffin. One Barnett was placed on the stand by the State and testified that he saw the appellant with a pistol on two occasions before the day of the homicide. A plat rather carefully drawn was introduced in evidence, and accompanies the record as a part of the same for our inspection. It was testified that the front of the porch was 28 inches from the ground; that the porch was 12 feet wide, and that the steps were

directly in front of the door, which was nearly in the center of the dining room; that directly in front of the steps 22 feet east was the yard gate. The justice of the peace, and another witness and Johnson testified that they found the bullet which was supposed to have gone through the body of Mrs. Johnson; that it struck the top railing to which the pickets of the yard fence were nailed about two feet south of the gate, and it was testified that said railing was 24 inches from the ground. Said plat discloses that the dining room, into which the door from the porch opened, was 14 x 16, and that in the center of the north wall of the dining room was a door leading into the bed room, which was 16 x 16, with a fire-place on the north side.

We have thus given substantially the testimony in the case. The witness Ivey appeared to be both a disinterested and reluctant witness. Acting upon the presumption that he acted as an ordinary man would, and took about the time usual for such things to be done, it would appear that when he heard the woman's voice and the report of the pistol, as testified to by him, he looked at the car, and from the car back to the yard where he says he then saw the woman standing with blood on her breast, and it becomes evident that a very short time must have elapsed from the shooting to his seeing the woman standing in the yard. Either when he saw the woman standing in the yard, or when he looked back after putting his hands over his eyes, and she had fallen, he also saw a man's form in the door or just through the door in the room. The doctor also testified that one shot as this woman was could have moved only a very short distance before succumbing to the shot. These facts would appear to make it practically impossible for the woman to have been shot in the house or in the door. If shot either in the house or in the door, she must have traversed the twelve foot porch and come down the five steps leading to the ground, and moved several steps to the north during the time it took Ivey to look at the car, and discovering nothing, to look back to the house. This seems to us impossible.

Again, we recognize that the deductions and conclusions as to the direction of a bullet after going through a body are not very satisfactory. No one testified to any bullet hole through the walls or door of said dining room, and it is evident that if the shot was fired in the manner and from the place that Johnson's testimony shows, to-wit: in the door leading from the dining room to the bed room, then the shot from the pistol must have gone through the open porch door of the dining room. In fact, a careful inspection of Johnson's testimony shows that he said when the appellant struck at him and the pistol fired, appellant was something like two feet inside the north or bed room. The disinterested witnesses who found the traces of the bullet and the bullet itself said it struck the railing twenty-four inches from the ground and about two feet south of the gate,

which was directly east and twenty-two feet from the steps. An examination of the plat, the measurements and correctness of which appear to be testified to and are for our edification, shows that from anywhere in the door leading from the dining room to the bed room a line through the porch door of the dining room would strike the fence west of the southeast corner of the yard at a distance of 20 or 30 feet from the gate. In order for this bullet to have been fired from the door between the dining room and bed room through the porch door of the dining room to the point near the gate, it must have been deflected from its course at a tremendous angle. The testimony of the doctor and Mrs. Stinson indicates that the bullet went straight through the woman's body. Again, it is difficult to conceive how this bullet, if fired from the door between the dining room and bed room, if the same had struck a woman of ordinary height standing in the front door, could have been so deflected downward in the short distance to the yard fence as to have struck said fence at a distance of 24 inches from the ground, that being less than the height of the floor of the porch. In other words, if the woman had been five feet tall, and had been struck in the breast at a height of four feet above the floor, and the bullet had gone straight through her body, it would have necessarily inclined downward to the extent of four feet or more before striking the fence some 30 feet away. These are mere deductions.

Again, there is nothing in the testimony of Johnson which in anywise accounts for the bleeding wound in the back of the appellant's head, which he told Ivey, a few minutes after the difficulty, had been inflicted upon him by Johnson, and of which he told Griffin shorty thereafter the same thing. Johnson said he had been sick with influenza and could not strike hard, and that when he struck appellant he staggered back a step or two—in one place, Johnson says, into the north room, and in another place, back against the door. There could be nothing in the contention that appellant's head come in contact with any part of the door with such force as to make this cut. The cut stands as a physical fact, in strict accord with the appellant's statements about it, and unexplained by anything in Johnson's testimony. Again, appellant and Johnson both testified that appellant was a right-handed man. Johnson says that when he saw appellant getting up in the north room he had a pistol in his left hand; that after getting his own pistol, and when he met appellant at the partition door, appellant still had the pistol in his left hand and hanging down by his side; that he had his own pistol by the handle and covered appellant with it; that appellant jerked it out of his hand with appellant's right hand, and that he immediately struck appellant as hard as he could on the neck, and that appellant at once straightened and struck at him with the pistol which he had jerked out of his hand; that during all this time appellant had the other pistol in his left hand. The natural and inevitable infer-

ence would be that appellant caught Johnson's pistol some where near the barrel or cylinder in order to jerk it out of his hand, and how he could have reversed that pistol with only one hand to accomplish this feat, and could do that while Johnson was striking him, and he was straightening up so that when he struck at Johnson with it, as Johnson says, the pistol would be completely turned around or turned over in appellant's hand, seems incredible. Unless there can be produced some other evidence than that which appears in this record, this court would not be willing to let a conviction stand for any grade of felonious homicide.

For the errors indicated the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*