**Olin Junior THOMAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1243–90.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 11, 1991.

Michael B. Charlton (on appeal only), Houston, for appellant.

Jim Mapel, Dist. Atty., and Jerome Aldrich, Asst. Dist. Atty., Angleton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

BENAVIDES, Judge.

Appellant was convicted of carrying a deadly weapon known as a "shank" inside a penal institution. *See* V.T.C.A., Penal Code, § 46.11(a)(1). His punishment, enhanced by two prior felony convictions, was assessed by the jury at confinement for life in the penitentiary. *See* V.T.C.A., Penal Code, § 12.42(d). But the Fourteenth Court of Appeals ordered a judgment of acquittal entered instead, holding the evidence constitutionally insufficient to sustain Appellant's conviction because the alleged object was actually a kind of knife, not a deadly weapon *per se*, and because the State failed to prove that Appellant actually used or intended to use it in a manner capable of causing death. *Thomas v. State*, 801 S.W.2d 540 (Tex.App.—Houston [14th] 1990). We granted the State's petition for review to determine whether the Court of Appeals erred by holding that a shank is necessarily not a deadly weapon under Section 1.07(a)(11)(A) of the Penal Code. *See* Tex.R.App.Proc. 200(c)(4), (5).

### I.

At the outset it is well to explain this Court's use over the years of the term "deadly weapon *per se*." There is a great deal of judicial history behind it, some predating present statutory definitions of "deadly weapon" by nearly a hundred years. Although we deem an exhaustive review of this case law unnecessary in the present context, it will perhaps be helpful to emphasize that our understanding of the phrase comes originally from a time when nothing, not even a firearm, was con-

sidered to be a deadly weapon without proof of the manner in which it was used. *See, e.g., Ballard v. State*, 13 S.W. 674 (Tex.App.1890); *Pierce v. State*, 21 Tex. App. 540, 1 S.W. 463 (1886); *Hunt v. State*, 6 Tex.App. 663 (1879). The only operative definition of the term at that time was developed by the courts for purposes of jury instruction and appellate review. One of its earliest epiphanies, approved by this Court, held that a deadly weapon was "[a]n instrument calculated and likely to produce death or serious bodily injury from the manner in which it is used[.]" *Hardy v. State*, 36 Tex.Crim. 400, 37 S.W. 434 (1896). *See also Miller v. State*, 140 Tex.Crim. 182, 143 S.W.2d 778, 779 (1940).

Eventually, we came to presume on appeal that a pistol or gun was necessarily such an instrument whenever used as a firearm, unless discharged only to frighten or from such a distance as to render the prospect of serious bodily injury improbable. *See Kosmoroski v. State*, 59 Tex. Crim. 296, 127 S.W. 1056, 1058 (1910); *Scott v. State*, 46 Tex.Crim. 315, 81 S.W. 952, 953 (1904); *Juley v. State*, 45 Tex. Crim. 391, 76 S.W. 468 (1903); *Angel v. State*, 45 Tex.Crim. 135, 74 S.W. 553, 554 (1903). However, when it was wielded as a club, we indulged no such presumption because the probability of causing death or serious bodily injury in such manner was not thought great enough to obviate the need for specific proof. *See, e.g., Chapman v. State*, 126 Tex.Crim. 645, 73 S.W.2d 536 (1934); *Peacock v. State*, 52 Tex.Crim. 432, 107 S.W. 346, 348 (1908). Accordingly, we held early on that "[a] pistol used as a bludgeon is not per se a deadly weapon." *Merritt v. State*, 85 Tex.Crim. 565, 213 S.W. 941, 942 (1919). Plainly, we meant that a pistol is not invariably likely to cause serious bodily injury when used to strike another person, even though it is always likely to do so when fired at someone.

One consequence of all this was that an instruction on the definition of "deadly weapon" might properly be omitted from the jury charge in a case to which it was otherwise applicable whenever the alleged weapon was shown to be deadly *per se*, since it was then subject to a court-made

presumption that, if used in a certain manner, it was likely to cause death or serious bodily injury. *See Short v. State*, 119 Tex. Crim. 34, 45 S.W.2d 587, 588 (1932); *Tiller v. State*, 97 Tex.Crim. 404, 261 S.W. 1030 (1924); *Lofton v. State*, 59 Tex.Crim. 270, 128 S.W. 384, 386 (1910). *Cf. Jackson v. State*, 90 Tex.Crim. 369, 371, 235 S.W. 882, 883 (1921). Likewise, the evidence at trial was thought to be sufficient if it demonstrated either that the alleged weapon was used in a manner likely to cause serious bodily injury or that it was regarded by judicial precedent as deadly *per se*. *See Lewis v. State*, 103 Tex.Crim. 82, 279 S.W. 819, 820 (1926); *McLendon v. State*, 66 S.W. 553, 554 (Tex.Crim.App.1902); *Stephenson v. State*, 33 Tex.Crim. 162, 25 S.W. 784 (1894).

Over the years, we were encouraged to develop similar presumptions for other implements. Almost without exception, these efforts failed. *E.g., Gipson v. State*, 403 S.W.2d 794 (Tex.Crim.App.1966) (can opener); *Woods v. State*, 152 Tex.Crim. 525, 215 S.W.2d 334 (1949) (hatchet); *Hawkins v. State*, 32 S.W.2d 202, 203–204 (Tex.Crim. App.1930) (eye hoe); *Morales v. State*, 110 Tex.Crim. 81, 8 S.W.2d 152, 153 (1928) (piano stool); *Fisher v. State*, 68 Tex.Crim. 297, 151 S.W. 544, 545 (1912) (saw); *Crow v. State*, 55 Tex.Crim. 200, 116 S.W. 52 (1909) (baseball bat); *Bush v. State*, 52 Tex.Crim. 398, 107 S.W. 348, 349 (1908) (ax). Most cases presented novel contexts, not likely to arise very often. But the widespread use of knives by those bent on the destruction of others provided, then as now, a recurring opportunity for evolution of the case law.

Because our deadly weapon jurisprudence often focused on the probability of a particular instrument causing serious injury, and not on whether it was merely capable of doing so, knives with blades of three inches, more or less, were not thought dangerous enough for a presumption of deadliness, even if wielded in such a manner as actually to cause death. *See Briscoe v. State*, 122 Tex.Crim. 491, 56 S.W.2d 458 (1933); *Carney v. State*, 109 Tex.Crim. 624, 6 S.W.2d 369, 370 (1928); *Henderson v.*

*State,* 55 Tex.Crim. 170, 115 S.W. 588, 590 (1909). Accordingly, for example, we held that "[p]ocketknives are not per se deadly weapons." *Craiger v. State,* 48 Tex.Crim. 500, 88 S.W. 208, 212 (1904) (opinion on rehearing). *See also Whitten v. State,* 28 S.W. 474, 475 (Tex.Crim.App.1894). Eventually, the same rule was applied to such things as hunting and fishing knives, *Goldman v. State,* 150 Tex.Crim. 24, 198 S.W.2d 895, 896 (1947), and finally, as a general matter, to all knives of unspecified size and character. *Simpson v. State,* 109 Tex. Crim. 373, 5 S.W.2d 159, 160 (1928). Occasionally, a knife was produced of such ominous appearance or prodigious dimensions that we awarded it special recognition as a necessarily deadly instrument. *E.g., Jones v. State,* 74 Tex.Crim. 205, 167 S.W. 1110, 1111 (1914). *Cf. Tatum v. State,* 159 Tex. Crim. 126, 261 S.W.2d 723 (1953). But, by and large, courts and practitioners could assert with confidence that knives were not deadly weapons *per se.*

Careful students of this distinction will usually find it to be illusory when taken out of context, or merely rhetorical otherwise. Nevertheless, the long-standing effect of our case law, if not of the distinction itself, has been that some specific evidence of deadliness, such as the dimensions of the object, the nature of the wounds it inflicted, the manner of its use, or testimony of its life-threatening capabilities was necessary to show that a particular knife in fact qualified as a deadly weapon under the law. *See, e.g., Williams v. State,* 477 S.W.2d 24, 25 (Tex.Crim.App.1972); *Barnes v. State,* 172 Tex.Crim. 303, 356 S.W.2d 679 (1962); *Gillingham v. State,* 167 Tex.Crim. 116, 318 S.W.2d 659 (1958); *Eagle v. State,* 135 Tex.Crim. 606, 122 S.W.2d 304 (1939); *Randolph v. State,* 101 Tex.Crim. 364, 275 S.W. 1043, 1044 (1925). The same was generally also held to be true of other potentially dangerous implements, except, of course, deadly weapons *per se.*

**II.**

Since adoption of our current Penal Code in 1974, the matter is entirely controlled by legislation. *Mosley v. State,* 545 S.W.2d 144 (Tex.Crim.App.1976) (opinion on original submission). This legislation introduced, among other innovations, a new method of describing deadly weapons. In addition to those objects which became deadly weapons by virtue of their usage, both actual and intended, other objects specifically designed, made, or adapted to cause serious bodily injury were classified as deadly weapons regardless of their usage. V.T.C.A., Penal Code, § 1.07(a)(11).[1]

Jurors are now instructed in the language of this statute, which currently prescribes the only meanings of "deadly weapon" applicable under the Penal Code, and trial judges are no longer at liberty to omit the statutory definition of "deadly weapon" from their jury instructions under any circumstances where it is a part of "the law applicable to the case[.]" Art. 36.14, V.A.C.C.P. As a result, there does not presently exist a class of objects comprised of deadly weapons *per se,* certainly not in the sense that a jury finding on the issue is somehow unnecessary. Rather, those objects formerly held to be deadly weapons as a matter of law, notably firearms, are now classified under the statutory definition as deadly weapons by design; but the force of inertia has impelled us to persist in calling them "deadly weapons *per se.*" *See, e.g., Ex parte Franklin,* 757 S.W.2d 778 (Tex.Crim.App.1988).

■ Of course, that phrase can no longer accurately signify exactly the same thing it once did. Apparently, what we now sometimes mean by the expression is any object meeting the definition set out in Texas Penal Code, Section 1.07(a)(11)(A). *See Gomez v. State,* 685 S.W.2d 333, 336 (Tex.Crim.App.1985). Thus, today, an ob-

---

**1.** This statute reads:

§ 1.07. Definitions
  (a) In this code:

    (11) "Deadly weapon" means:

  (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or
  (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

ject may be a deadly weapon *per se* if it is either "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" *Lewis v. State,* 628 S.W.2d 276, 278 (Tex.App.—Amarillo 1982). By continuing to employ the nonstatutory idiom "deadly weapon *per se*" we do not mean to suggest, and have not meant to suggest in past opinions, that a particular object alleged as a deadly weapon in the State's charging instrument need not be proven at trial to meet the statutory definition of a deadly weapon. We mean only to say that, as under former law, there is no specific requirement that proof show the alleged weapon was "in the manner of its use or intended use capable of causing death or serious bodily injury." *Cf.* V.T.C.A., Penal Code, § 1.07(a)(11)(B). Instead, the evidence is now fully adequate if it shows the weapon to be deadly by design, rather than by usage.

For example, an object meets the statutory definition of a deadly weapon if it is a firearm. The State must simply prove at trial that it was a firearm in fact. Similarly, the State may prove that any object other than a firearm is also a deadly weapon by adducing sufficient evidence that it was, in fact, "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" If the evidence is adequate for such purpose, then it is sufficient to establish the object as a deadly weapon. No other proof is required. In particular, it is not necessary to verify that the object was really capable of causing death, either in the manner of its actual use or in the manner of its intended use. *See Walker v. State,* 543 S.W.2d 634, 636–637 (Tex.Crim.App.1976).

■ This applies to knives as well. The fact that we have often said, even after enactment of the 1974 Penal Code, that knives are not deadly weapons *per se* does not, of course, mean that no variety of knife is manifestly designed to cause death. *Cf., e.g., Hawkins v. State,* 605 S.W.2d 586, 588 (Tex.Crim.App.1980); *Limuel v. State,* 568 S.W.2d 309, 311–312 (Tex.Crim.App. 1978). Clearly, bayonets, scimitars, and swords of various kinds are designed for such purpose and, therefore, could qualify as deadly weapons under Section 1.07(a)(11)(A). Kitchen knives, utility knives, straight razors, and eating utensils are manifestly designed and made for other purposes and, consequently, do not qualify as deadly weapons unless actually used or intended to be used in such a way as to cause death or serious bodily injury within the meaning of Section 1.07(a)(11)(B). Whether a particular knife is a deadly weapon by design, a deadly weapon by usage, or not a deadly weapon at all, therefore, depends upon the evidence.

The same is, of course, also true of every other object in the world, including automobiles, telephone cords, bathwater, feather pillows, golf clubs or shanks. In the instant cause we are concerned particularly with the last of these. The Court of Appeals did not evaluate the State's evidence for its sufficiency to prove that the shank here in question was manifestly adapted to cause death or serious bodily injury. Instead, the court held that a shank is a knife, that a knife is not a deadly weapon *per se,* and that the evidence here did not show the shank in question to have been used or intended to cause death or serious bodily injury. We find faults in this analysis.

In the first place, the record does not disclose any evidence to the effect that a "shank" is really a kind of "knife." Throughout trial and in the lower court's opinion shanks were invariably described as "homemade stabbing devices." No one specifically testified that the one involved in this case was a knife, the trial judge took no judicial notice that it was, and we cannot say whether it appeared knife-like because no picture of it is included in the appellate record. The verbal description given at trial, however, puts one more in mind of a nail than of a knife. Consequently, those cases holding that a "knife" is not a deadly weapon *per se* aren't clearly applicable in this context anyway.

■ More to the point, even assuming that shanks are, by definition, knife-like objects for purposes of the criminal law, it

should be clear from the foregoing discussion that a knife qualifies as a deadly weapon, just as does any other object, whenever it is "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" And because the State is not required to show that a knife of this kind was actually used or intended to be used in a manner capable of causing death or serious bodily injury, failure of the State to prove actual or intended use does not end the inquiry on appeal. The lower court was in error to hold that it does without first deciding whether the "shank" in question here might have been a deadly weapon by design.[2]

On remand the Court of Appeals must adjudge whether the evidence adduced at trial was constitutionally sufficient to support a rational finding of fact by the jury that the object in question was "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" If it was, the judgment of conviction may not be reversed for failure of the State to prove that the object carried by Appellant was a deadly weapon.

The judgment of the Court of Appeals is reversed and the cause is remanded for reevaluation of evidentiary sufficiency under Appellant's second point of error in a manner not inconsistent with this opinion and for the consideration of appellant's points of error not previously addressed by the court of appeals.

OVERSTREET, J., concurs in the result.

BAIRD, J., not participating.

---

**2.** For example, without suggesting how the question should ultimately be resolved by the Court of Appeals, we note that the State produced testimony at trial to the effect that the object seized from Appellant had "been manifestly designed and made or adapted for the purpose of inflicting death or serious bodily injury[.]" SF 87.