NUMBER 13-04-00298-CR


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS


 

CORPUS CHRISTI - EDINBURG 


 


SONNY WADE WILSON, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 156th District Court of Bee County, Texas.


 


 DISSENTING MEMORANDUM OPINION


 

Before Chief Justice Valdez and Justices Rodriguez and Amidei (1)


Dissenting Memorandum Opinion by Justice Amidei


 

 Appellant, Sonny Wade Wilson, appeals from a jury verdict convicting him on both
counts of a two-count indictment: (1) Count 1, for aggravated assault with a deadly weapon
on a correction officer; and (2) Count 2, for possession of a deadly weapon in a penal
institution. The trial judge assessed his punishment, enhanced by one prior felony
conviction, at life in prison and a $10,000 fine on Count 1, and twenty years in prison and
a $10,000 fine on Count 2. 

 Although ten issues were urged, for purposes of this appeal, I would find it
necessary to address only appellant's ninth and tenth issues challenging the legal
sufficiency of the evidence. A challenge to the sufficiency of the evidence should be
considered before disposing of a case even though reversal may be based on another
ground. Graham v. State, 643 S.W.2d 920, 924 (Tex. Crim. App. 1983). The reasoning
being, if sustained, a retrial would be barred. Id. Contrary to the majority, I would reverse
and acquit.

Factual Background

 Appellant, an inmate at the McConnell Unit in Bee County, Texas, protested that he
had been harassed by frequent cell moves and a proposed new cell-mate assignment. He
was instructed to gather his belongings so he could be transferred to a holding facility
pending a hearing of his protest. While being escorted out of his cell, appellant resisted
being handcuffed, a scuffle ensued, and two correctional officers received minor injuries.
The officers did not get a good look at the object appellant used to injure them, although
a metal rod sharpened on one end and a plastic razor handle with approximately seven
razor blades attached to one end were found on the floor nearby after appellant was
subdued.

Issues

 Appellant's ninth and tenth issues aver the evidence was legally insufficient to
sustain his convictions under Counts 1 and 2 of the indictment. These issues are
considered together because they both include the issue of whether the weapon in
question was a deadly weapon.

Standard of Review

 The inquiry on review of the legal sufficiency of the evidence to support a criminal
conviction is whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt after viewing the evidence in a light most favorable
to the prosecution. Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003) (citing
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). We review the record to determine
whether, after viewing the evidence in the light most favorable to the State, any rational jury
could have found beyond a reasonable doubt that anything in the manner or use of the
objects in question by appellant was capable of causing death or serious bodily injury. (2) 

 Appellant argues the State did not prove that he assaulted a public servant by using
or exhibiting a deadly weapon or that he possessed a deadly weapon because there is no
proof the correctional officers received serious bodily injuries. Count 1 of the indictment
charges appellant with aggravated assault under Texas Penal Code section 
22.02(a)(2),(b)(2) (Vernon 2005), a first degree felony, and in pertinent part alleges the
following:

 [O]n or about the 15th day of October, A.D., 2002 and before the presentment
of this indictment, in the County and State aforesaid, [appellant] did then and
there intentionally, knowingly, or recklessly cause bodily injury to Andres
Garza by stabbing Andres Garza's left arm, and the defendant did then and
there use or exhibit a deadly weapon (3), to-wit: a metal rod approximately 8
½ inches sharpened on one end and bent on the other end with string
wrapped around the bent end for a handle and a plastic razor handle
wrapped with string that has approximately seven razor blades
attached to the opposite end measuring about 6 inches in total length,
during the commission of said assault, and the defendant did then and
there know that the said Andres Garza was then and there a public servant,
to-wit: A Correctional officer with the Texas Department of Criminal
Justice-Institutional Division, McConnell Unit, in Bee County, Texas and that
the said Andres Garza was then and there lawfully discharging an official
duty, to-wit: Supervising inmates.


 Count 2 charges that on or about October 15, 2002, while confined in a penal
institution, appellant intentionally or knowingly possessed a deadly weapon as described
in Count 1, a third degree felony. (4) Punishment was enhanced to the level of a second
degree felony because the jury found a prior conviction. 

 A person commits aggravated assault if he intentionally, knowingly or recklessly
causes bodily injury to another by using or exhibiting a deadly weapon. See Tex. Pen.
Code Ann. § 22.01(a)(1) & 22.02(a)(2) (Vernon 1994). It is a first degree felony if the
aggravated assault is committed against a person the actor knows is a public servant while
the public servant is lawfully discharging an official duty, or in retaliation, or on account of
an exercise of official power or performance of an official duty as a public servant. See
Tex. Pen. Code Ann. § 22.02(b)(2). 

 The Texas Penal Code defines "deadly weapon" to mean the following: 

 (A) a firearm or anything manifestly designed, made, or adapted for
the purpose of inflicting death or serious bodily injury; or


 (B) anything that in the manner of its use or intended use is capable
of causing death or serious bodily injury. (5)


Id. § 1.07(a)(17)(A)(B).

 Objects that are not usually considered dangerous weapons may become so,
depending on the manner in which they are used during the commission of an offense.
Thomas v. State, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991). In proving an object to be
a deadly weapon under subsection (B), an injury is not per se, serious bodily injury, even
if caused by a deadly weapon. Moore v. State, 739 S.W.2d 347, 352 (Tex. Crim. App.
1987); Williams v. State, 696 S.W.2d 896, 898 (Tex. Crim. App. 1985). In Moore, the
court's opinion in Williams by Judge W.C. Davis was quoted as being highly instructive, in
pertinent part, as follows:

 There, this Court, through Judge Davis, emphasized the following: A knife
wound, or a gunshot wound, although caused by a deadly weapon such as
a knife or a gun, is not, per se, serious bodily injury. The shooting [or stabbing] of an individual is a serious and grave matter. Yet it is the burden
of the State to prove that such an act created a substantial risk of death, or
caused death, a serious permanent disfigurement, or protracted loss or impairment of the functions of any bodily member or organ. See V.T.C.A.
Penal Code, Sec. 1.07 (a) (34). (898). 


Moore, 739 S.W.2d at 352.

 "Bodily injury" and "serious bodily injury" were properly defined in the jury charge as
follows:

 "Bodily Injury" means physical pain, illness, or any impairment of physical
condition.


 "Serious Bodily Injury" means bodily injury that creates a substantial risk of
death or that causes death, serious permanent disfigurement, or protracted
loss or impairment of the function of any bodily member or organ.


 "Serious Bodily Injury" is defined in the penal code to mean the following: "bodily
injury that creates a substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily member or
organ." Tex. Pen. Code Ann. § 1.07(a)(34) (Vernon 1994). "Bodily injury" is defined in the
penal code to mean the following: "physical pain, illness, or any impairment of physical
condition." Tex. Pen. Code Ann. § 1.07(a)(8)(Vernon Supp. 2006). By virtue of the fact
that the penal code provides a different definition for "bodily injury" from "serious bodily
injury," though often a matter of degree, we must presume that the Legislature intended
that there be a meaningful difference or distinction between "bodily injury" and "serious
bodily injury." Moore, 739 S.W.2d at 348-49. Understandably, this means that where the
issue is raised, the issue must be determined on an ad hoc basis. Id. 

The Evidence

 The State offered the witnesses and exhibits as follows.

 Gabriel Gomez, who was on duty at the McConnell Unit as a correctional officer on
October 15, 2002, testified he was behind appellant when Sergeant Andres Garza
attempted to grab appellant. Appellant began jabbing with his hands at Sergeant Garza's
stomach and chest area. Gomez was blinded by pepper spray for a while and did not see
that appellant had any weapons, but found out after the scuffle there was an eight inch rod
and a six inch plastic device with razor blades which he assumed appellant took out of his
jacket. Gomez testified that he was "slashed," that is, his skin was barely grazed in the
area where his Texas Department of Corrections patch protected him, but the injury was
nothing more than a scratch. He assumed he was cut by the weapon Tommy Perez later
showed him.

 Andres Garza, who was on duty at the McConnell Unit as a correctional officer on
October 15, 2002, testified that he was not sure what had happened, except that appellant
swung at him when he stepped toward him to initiate force. He did not actually see any
kind of weapon. Specifically, he did not clearly see any weapons in appellant's hands but
he did see a grayish rod-shaped metal object, a home-made weapon, which could have
been a pen. Garza was stabbed in his left arm and chest. He testified he did not see any
bleeding or whatnot. He testified that he sustained four bruises to his chest and he was
struck on the arm. He testified that he did not see the weapon afterward, but he saw
photographs of it with which he used to describe the weapon in his disciplinary report as
an "eight-three" inch plastic spoon with razor blades. According to Garza, the photograph,
State's Exhibit No. 5, looked like the weapon used to assault him.

 Miguel Rene Padron, who was on duty at the McConnell Unit as a
correctional officer on October 15, 2002, testified that he did not see what appellant had
inside his hand, but after appellant made his first swing at Sergeant Garza and brought his
hand back, Padron saw that it was a weapon. He could not tell what sort of a weapon it
was. He saw an extension inside appellant's wrist which was not gray and could have
been anything.

 Michael Scotten, who was a criminal investigator for the Department of Criminal
Justice in October 2002, testified as follows:

 1. He was called to investigate the incident in question after it occurred;


 2. He recognized and described what was portrayed by State's Exhibits Nos. 9-A (6)
and 8-A (7) as, "[w]hat we call prison-made shanks;" 


 3. He came in contact with the "shanks" when corrections officer Tommy Perez
handed them to him; he turned them over to investigator Koenig; however, on cross
examination he testified that officer Padron gave him the weapons;


 4. He came in contact with victim Gabriel Gomez;


 5. He took the shirt contained in a paper sack marked State's Exhibit 10 off of victim
Gomez at the McConnell Unit;


 6. The shirt had a tear on the left shoulder;


 7. He worked fifteen years as a certified police officer, including eight years at the
Office of Inspector General;


 8. He came in contact with weapons "like this;"


 9. He has seen what "those" weapons can do to individuals;


 10. He has seen individuals who had been assaulted with weapons "like this" on a
"few" or "many" occasions;


 11. He described the "shank" as a metal rod approximately eight and one-half
inches in length, sharpened on one end, and bent on the other end with string wrapped
around the bent end of the handle;


 12. He described State's Exhibit 8-A as a plastic razor handle wrapped with string
that has approximately seven razor blades attached to the opposite end measuring about
six inches in total length;


 13. These weapons were recovered from inside of a penal institution on October 15,
2002 at the McConnell Unit; and,


 14. Based on his experience as a police officer and observation of these two
weapons, his opinion was that those two weapons are capable of causing death or serious
bodily injury.


 Nina Vaughn, LVN, testified that Andres Garza was ambulatory following the
incident in question and walked into the clinic for treatment. He had a wound on his left
arm, right around the deltoid, which was the size of about one-half centimeter or about the
size of half the tip of her thumb or finger. (8) She did not know how deep the cut was. 
According to Vaughn, a pick, or something round or pointed, was used to create this
puncture. She pulled the cut apart and cleaned it out. Garza's chest had a three
centimeter area of light bruising. On the third and fourth knuckles of his right hand, Garza
had two superficial cuts which Vaughn described as knife-blade-like lacerations. She
cleaned and bandaged the wounds and told him to follow up with his doctor in case of
infection, hepatitis, lockjaw if he was not current with his tetanus shot - she didn't give him
any injections or treat him for shock or anything. According to Vaughn, the weapon with
the razor blades could create or cause such injuries. 

 Rhonda Cubbage, an RN, testified that when she saw Gabriel Gomez, his arm, face,
and neck were red. She did not recall whether his shirt was torn. Gomez had two
scratches on his upper arm, but she did not recall the size of the scratches. One of the
scratches appeared much as an abrasion, like the skin being rubbed. She washed the
scratch. 

 Admitted into evidence without objection were State's Exhibits Nos. 3 and 6, which
were photographs depicting the injuries to witnesses Gomez and Garza.

 Contrary to the majority's analysis, there is no evidence of anything in the manner
of the shanks' use that was capable of causing death or serious bodily injury. There is no
evidence that anything in the intended use of the shanks that was capable of causing
death or serious bodily injury. Other than the glimpses of the shanks in question during the
scuffle described by the corrections officers, there was no testimony that appellant
displayed the shanks or used any threatening words or gestures toward the guards. 
Appellant did not suddenly jab at the officers with the shank or shanks until after force was
used on him to apply handcuffs.

Bodily Injuries

 Appellant challenges the sufficiency of the evidence which the jury used to support
its implicit finding that correction officers Gomez and/or Garza sustained serious bodily
injuries. Infliction of serious bodily injuries has been held to be necessary in determining
whether a knife is a deadly weapon in its use or intended use. Thomas, 821 S.W.2d at
619.

 Apparently it is the position of the State that it is not necessary to make a decision
about the injuries of Officer Gomez since the indictment only names Andres Garza as a
victim, and the prosecutor only argued this subject to the jury. However, the seriousness
of the injuries to either or both officers are important factors in determining whether the
weapons were deadly weapons. Id.

 Although the person who has received the injuries is qualified to express an opinion
as to their seriousness, Officers Gomez and Garza never testified their injuries created a
substantial risk of death, or caused permanent disfigurement, or protracted loss or
impairment of the functions of any bodily member or organ within the Texas Penal Code
definition of serious bodily injury. Hart v. State, 581 S.W.2d 675, 677 (Tex. Crim. App.
1979). The nurses who treated the officers described minor superficial injuries and in no
way indicated the injuries were serious bodily injuries. There was a scrape wound and a
cut or puncture less than one-fourth inch in length and of unknown depth. These injuries
required treatment of the most minor nature, not involving sutures, injections, pain
medication, hospitalization, doctors or x-rays, and there was no indication the officers had
any follow up treatment. The correctional officers who were injured did not describe their
injuries as being serious. I would find that the injuries were superficial and not serious
bodily injuries. 

Manner of Use

 Subsection (A) of the deadly weapon definition refers to weapons that are deadly
weapons per se. See Tex. Pen. Code Ann. § 1.07(a)(17)(A), (B) (Vernon Supp. 2006). 
A knife is not a deadly weapon per se. Denham v. State, 574 S.W.2d 129, 130 (Tex. Crim.
App. 1978). A homemade stabbing device, a "shank" in this case, is not a deadly weapon
per se. Thus, in order for the "shank" to qualify as a deadly weapon, we must look to "the
manner of its use or intended use." Thomas v. State, 801 S.W.2d 540, 541 (Tex.
App.-Houston [14th Dist.] 1990), rev'd on other grounds, 821 S.W.2d 616 (Tex. Crim. App.
1991). Thomas was reversed only to require the court of appeals to evaluate evidence for
its sufficiency to prove the shank in that case was manifestly adapted to cause death or
serious bodily injury to support a subsection (A) (deadly weapon by design) jury finding. 
The Texas Court of Criminal Appeals in Thomas did not hold that shanks were deadly
weapons per se or that all cases involving shanks should be tried as subsection (A) cases. 
Instead, the court clearly expressed that cases may be tried under subsection (A) or
subsection (B) depending on the evidence by holding:

 Whether a particular knife is a deadly weapon by design, a deadly weapon
by usage or not a deadly weapon at all, therefore, depends upon the evidence.


 The same is, of course, also true of every other object in the world, including
automobiles, telephone cords, bathwater, feather pillows, golf clubs or
shanks.


821 S.W.2d at 620. 

 In this case, there were no allegations or proof the shanks were manifestly
designed, made, or adapted for the purpose of inflicting death or serious bodily injury. The
trial court focused on subsection (B) and charged the jury with the deadly weapon
definition, that being, "deadly weapon" as "anything that in the manner of its use or
intended use is capable of causing death or serious bodily injury." The charge indicates
the case was tried and submitted under subsection (B) (9) rather than subsection (A). (10) The
State chose to prosecute under subsection (B) only. (11) Therefore, the State had the burden
to prove beyond a reasonable doubt that the manner of use by appellant of the shanks
made them capable of causing serious bodily injury or death. Id. Without any reference
to anything in the manner appellant used or intended to use the shanks in question,
Michael Scotten simply concluded, "They were capable of causing death or serious bodily
injury." 

 A statement of opinion of an expert must be based on facts perceived by, reviewed
by, or made known to the expert at or before the hearing. Tex. R. Evid. 703. However,
Scotten's testimony indicated he (1) did not perceive, (2) had not reviewed, or (3) had not
been made known, the facts regarding the manner of use of the shanks. His opinion was
not given in response to questions predicated or based on facts describing how or in what
manner appellant used or intended to use the shanks which made them capable of causing
death or serious bodily injury. Therefore, he did not testify that the manner in which
appellant used the shanks could cause death or serious bodily injury. The jury could not
infer manner of use from Scotten's testimony. All the jury could infer is that the manner of
use of the shanks did not cause death or serious bodily injury which would have been from
the correctional officers' testimony as to what actually happened The subsection (B) jury
finding cannot be supported in the absence of manner of use proof. It is not a matter of
Scotten's credibility or qualifications as an expert witness. 

 With the exception that the charge was not supported by legally sufficient evidence
as I have herein discussed, the trial court was correct in submitting the case to the jury
under subsection (B) only, although it could be argued Thomas requires the trial court
"under any circumstances" to submit under both subsections (A) and (B) where it is a part
of "the law applicable to the case." Id. at 619. However, I would find that subsection (A)
is not applicable to this case because there was no allegation or proof that the objects in
question were manifestly designed, made, or adapted for the purpose of inflicting death or
serious bodily injury. Id. In any event, the State made no request to include subsection
(A) in the charge, and made no objection that a submission under subsection (A) was
omitted from the charge. Id. The trial court did not charge the jury on subdivision (A) and
the jury could not have made a subsection (A) finding. (12) The charge cannot be made
hypothetically correct by assuming a subsection (A) submission. Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997).

Intended Use

 We must determine if the jury could have found that it was appellant's intent to use
the shanks in such a manner that they would be capable of causing serious bodily injury
or death. McCain v. State, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). 

 The evidence showed that there was a brief struggle between appellant and the
correctional officers after appellant had the opportunity to take a swing at the officers with
the shank. One of the officers was attempting to put handcuffs on appellant, and appellant
was close to the officers. Appellant was subdued before he could use the shank again. 
There was no evidence that appellant threatened or expressed an intent to use the shank
or shanks in a manner that would be capable of causing serious bodily injury or death
either at the time alleged in the indictment or at any time in the future. Appellant said
nothing to the officers regarding the shanks or whether he intended to cause them serious
bodily injury or death. There was no evidence as to why appellant possessed the shanks
or any prior use he made of them. While the placement of the word "capable" in the
definition of deadly weapon may have been to cover conduct that threatens deadly force,
even if the actor has no intention of actually using deadly force, we cannot infer that
appellant's conduct threatened deadly force in the sense that he either intended to cause
serious bodily injuries or, since there were no serious bodily injuries the mere existence of
the shanks and the way they looked threatened deadly force. Cf. Bailey v. State, 38
S.W.3d 157, 158-59 (Tex. Crim. App. 2001) (holding that a defendant who used a board
to beat his estranged wife with threats to permanently silence her was conduct which
threatened deadly force). Appellant made no verbal threats and did not display the shanks
in a threatening manner. The correctional officers who were injured did not see the shanks
before they were injured. The other officer only had a glimpse of the shank after appellant
made his first swing at Sergeant Garza. A weapon cannot be considered deadly just
because it may look deadly.

 The Texas Court of Criminal Appeals has approved several factors to be used in
determining whether an object is capable of causing death or serious bodily injury: (1)
physical proximity between the victim and the object, Tisdale v. State, 686 S.W.2d 110,
115 (Tex. Crim. App. 1984); (2) the threats or words used by the defendant, Williams v.
State, 575 S.W.2d 30, 32 (Tex. Crim. App. 1979); (3) the size and shape of the weapon,
Balin v. State, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983); (4) the weapon's ability to
inflict death or serious injury; id.; and (5) the manner in which the defendant used the
weapon. Id. No one factor is determinative, and each case must be examined on its own
facts. Id.; see Hester v. State, 909 S.W.2d 174, 179 (Tex. App.-Dallas 1995, no pet.)
(citing Brown v. State, 716 S.W.2d 939, 947 (Tex. Crim. App. 1986)). 

 The majority cites Dominique v. State, 598 SW2d 285, 286 (Tex. Crim. App. 1980)
and Denham v. State, 574 SW2d 129, 130 (Tex. Crim. App.1978) to argue that serious
bodily injuries are not a prerequisite for the shanks to be found deadly weapons, but those
cases are distinguishable. In Dominique and Denham there was abundant proof as to the
manner of use, intended use, threats and injuries whereas in the instant case where there
are no threats, scant evidence of the manner of use, or intended use which makes the
seriousness of the injuries the most important if not the only factor in such connection.
Moore v. State, 739 S.W.2d 347, 352 (Tex. Crim. App. 1987); Williams v. State, 696
S.W.2d 896, 898 (Tex. Crim. App. 1985) (it is the burden of the State to prove that a knife
wound created a substantial risk of death, or caused death, serious permanent
disfigurement, or protracted loss or impairment of the functions of any bodily member or
organ). Infliction of serious bodily injuries has been held to be necessary in determining
whether a knife is a deadly weapon in its use or intended use. Thomas, 821 S.W.2d at
619.

1. Proximity and Threats


 The close proximity to the correctional officers allowed them to subdue appellant
quickly to prevent another opportunity to inflict injury. Appellant made no threats.

2. Size and Shape of the Weapon & Ability


to Inflict Death or Serious Injury



 The State produced the shanks. They were described in the testimony of Michael
Scotten as a metal rod approximately eight and one-half inches in length, sharpened on
one end, and bent on the other end with string wrapped around the bent end of the handle,
and a plastic razor handle wrapped with string that has approximately seven razor blades
attached to the opposite end measuring about six inches in total length. Further, Scotten
testified he had seen what weapons "like this" can do to individuals, and based on his
experience as a police officer, those two weapons are capable of causing death or bodily
injury. Scotten's testimony cannot be a factor in determining whether the shanks were
capable of causing death or serious bodily injury because it was made without reference
to the manner appellant used or intended to use the shanks in question. He did not testify
the shanks were capable of causing death or serious bodily injury in the manner appellant
used or intended to use them.

 Under the facts of the case, the shanks did not have the ability to inflict death or
serious bodily injury because the injuries inflicted were minor, superficial injuries. We
cannot speculate what the ability of the shanks may have been under different facts or a
hypothetical situation which would have afforded appellant a better opportunity or more
opportunities to use the shanks to inflict death or a serious bodily injury. Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). Capability of the weapons is evaluated
based on the circumstances that existed at the time of the offense. Id. In other words, the
"capability" must be evaluated in light of what did happen rather than the conjecture about
what might have happened if the facts had been different than they were. Williams v.
State, 946 SW2d 432, 435 (Tex. App.-Fort Worth 1970, dism'd, 970 SW2d 566 (Tex.
Crim. App. 1998). I would find that any intended use other than the use appellant actually
made of the shanks at the time of the alleged offense would be hypothetical and could not
support a deadly weapon finding.

3. The Manner in Which Appellant Used the Weapons


 The manner in which appellant used the weapons was to inflict minor, superficial
injuries on the correctional officers. 

 Although the actual manner of use was supported by the evidence, it was
insufficient to prove appellant's use of the shanks was capable of causing death or serious
bodily injuries in order to support the jury's finding they were deadly weapons. Appellant's
intended use of the shanks was the same as the manner he actually used the shanks. It
must be presumed there was no other use intended because there is no evidence that
appellant had any other intended use. There is not evidence that appellant intended to use
the shanks to inflict serious bodily injuries. No one testified as to appellant's intent in
possessing or using the shanks. Thus, it must be presumed his only intent was to inflict
bodily injuries, not serious bodily injuries. The jury could not infer serious bodily injuries
even if the shanks were considered deadly weapons. See Moore, 739 S.W.2d at 352. 

Legal Sufficiency


 As a matter of law, after considering the evidence in the light most favorable to the
verdict, I would find the evidence legally insufficient because any rational trier of fact could
not have found the evidence sufficient to establish beyond a reasonable doubt:

 (a) That appellant's use of the shanks caused death or serious bodily injuries;

 (b) That Gabriel Gomez or Andres Garza sustained serious bodily injuries by
appellant's use of the shanks as defined in the Texas Penal Code; 

 (c) That the shanks were used in a manner showing an intent to cause death or
serious bodily injury;

 (d) That anything in the manner of use or intended use of the shanks made them
capable of causing death or serious bodily injuries; 

 (e) That the shanks were deadly weapons as defined in the Texas Penal Code. 

 The prosecution did not meet the requirements of Texas Penal Code section
1.07(a)(17)(B). Thus, the evidence was legally insufficient for the jury to find beyond a
reasonable doubt that the shanks were deadly weapons as is required for conviction under
the penal code. See Tex. Pen. Code Ann. §§ 22.02(b)(2); § 46.10(a)(1). I would sustain
appellant's ninth and tenth issues. As sustaining appellant's ninth and tenth issues would
dispose of the case, it would not be necessary to discuss the other eight issues. See Tex.
R. App. P. 47.1. 

Conclusion


 I would reverse the convictions and direct the court below to enter a judgment of
acquittal. 


 MAURICE AMIDEI

 Justice



 


Do not publish. 

Tex. R. App. P. 47.2(b).


Dissenting Memorandum Opinion delivered 

and filed this the 31st day of May, 2007.

 

 
1. Former Justice Maurice Amidei assigned to this Court by the Chief Justice of the Supreme Court of Texas
pursuant to the government code. See Tex. Gov't Code Ann. §74.003 (Vernon 2005).

2. See Tex. Pen. Code Ann. § 1.07(a)(17)(B) (Vernon 1994).
3. All emphasis is ours throughout unless otherwise noted.
4. Tex. Pen. Code Ann. § 46.10(a)(2) (Vernon 1994).
5. Tex. Pen. Code Ann. § 1.07(a)(17)(A)(B) (Vernon 1994).
6. A metal rod that is approximately eight-and-one half inches in length, sharpened on one end and bent on the
other and with string wrapped around the bent end of the handle.
7. A plastic razor handle wrapped with string that has approximately seven razor blades attached to the opposite
end measuring about six inches in total length. 
8. A centimeter is 0.39 of an inch, or less than 3/8 of an inch. 
9. Tex. Pen. Code Ann. §1.07(a)(17)(B) (1994).
10. Tex. Pen. Code Ann. §1.07(a)(17)(A) (1994).
11. Thomas v. State, 825 S.W.2d 758, 760 (Tex. App.-Houston [14th Dist.] 1992, no pet.) (on remand, a
prosecution may be brought under either subsection (A) or subsection (B)).
12. Tex. Code Crim. Proc. Ann. arts. 36.13, 36.14 (Vernon 1965). The jury was bound to receive the law from
the court and be governed thereby. The trial court was required to submit a written charge distinctly setting
forth the law applicable to the case.