

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

Nos. 07-13-00412-CR
07-13-00413-CR

JAMES HENRY GIBSON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 47th District Court
Randall County, Texas
Trial Court No. 24,276-A, 24,329-A, Honorable Dan L. Schaap, Presiding

August 25, 2014

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, James Henry Gibson, appeals the trial court's judgments of conviction in which he was found guilty of aggravated assault and aggravated sexual assault and sentenced to 25 years' imprisonment for each offense, those sentences to run concurrently.[1] On appeal, he challenges the sufficiency of the evidence to support the deadly-weapon element of aggravated assault and the nonconsensual and deadly-

---

[1] See TEX. PENAL CODE ANN. § 22.02 (West 2011), §§ 22.01, 22.021 (West Supp. 2014).

weapon elements of aggravated sexual assault, maintaining that the evidence was insufficient to support either conviction. We will affirm.

## Factual and Procedural History

Sherry Morris's son, Chaz, introduced her to a man he had known for a couple of weeks, a man who was later identified as appellant. Chaz asked his mother if she could drive appellant to go grocery shopping on his food stamp card. Morris met with appellant the night before to confirm where he lived. When she found the motel at which appellant was living, the two made their introductions, and Morris stayed about five minutes as they made plans to meet the next morning to go grocery shopping. As planned, Morris arrived at appellant's motel room the next morning, March 8, 2012, at about 10:00 a.m. to find that appellant's room had been burglarized and some of his medications stolen. In the crowd of investigating officers and spectators, Morris found appellant, who asked her if he could put the remainder of his belongings in Morris's car because appellant did not want to stay at that particular motel any longer. Morris agreed.

After Morris confirmed that she did not have to work later that day, she took appellant to a pharmacy to refill his prescription medications that had been stolen from his room. By this time, it was around noon, and the two then decided to go to the liquor store where appellant bought a bottle of bourbon. The two proceeded to the grocery store as they had originally planned and then returned to Chaz's house, where Morris had been living for the past several months. Morris and appellant remained at Chaz's house until approximately 5:00 p.m., when the two decided to go play slot machines.

2

The two played slot machines with appellant's money and drank the bourbon appellant had purchased earlier in the day. Over the next two hours or so, the two continued to drink and visited at least two other gaming establishments before heading to a nearby bar to have more drinks and play billiards and darts. They stayed at this bar for a few hours. Citing the need for sleep before working the next day, Morris wanted to call it a night, but appellant wanted more beer. Knowing that it was too late to purchase beer legally, appellant explained to Morris that he knew of a bar where he could purchase some beer to go and asked Morris to take him there. She agreed. The two had to wait outside in the cold for about an hour to get into the bar, and appellant expressed some dissatisfaction with or bitterness toward the clientele of that establishment for being so young. As consolation, Morris promised to make him the envy of the bar once they were inside and on the dance floor.

Morris testified that appellant had not made any inappropriate or sexually-explicit comments toward her the entire day and that the two had not had flirtatious interaction that day, with, perhaps, the exception being the promise she made to dance with him. Once inside the very busy establishment, appellant went to the bar in the hope of buying some beer quickly and then leaving; Morris found a seat near the dance floor to wait on him. Appellant returned about five minutes later and sat down in the chair Morris just vacated. As promised, Morris put one foot on the chair and one foot behind him and "gyrated around a little bit." She did so only very briefly because someone inside the bar shouted instructions for her to cease her gyration and she did. She commented to appellant something to the effect that, yes, she did indeed make every

3

man in the bar wish he could be appellant. She and appellant high-fived one another and then left so that she could drop him off at his new room.

Once there and checked in, appellant invited Morris up to his room, an invitation which she initially declined, again citing work. But appellant persisted and persuaded her to come up to the room so, at least, she would know where he was in case he needed her for something.

When the two arrived at the new room and Morris acknowledged that she now knew where his new room was, she indicated she was ready to leave. At that point, according to Morris, appellant hit her in the head with the base or foundation part of some spiked brass knuckles and spun her around and put her on the bed.

After appellant forced Morris onto the bed, he straddled her, wielded a knife in one hand, and placed the spiked portion of his brass knuckles on the other hand on her face near her left eye. He deemed her "a tease" and "a whore" who "deserved to die." He moved the knife back and forth across her abdomen and announced his intention to "gut" her. Appellant repeated many of the same threats, and Morris repeatedly begged him not to kill her. She described her fear of what it was going to feel like when appellant stabbed her. Appellant inflicted two minor cuts or abrasions on Morris with the knife, and she began to struggle and bargain with appellant, explaining that she did not want to die and asking what he wanted. Appellant responded that "it was too late," but, when Morris asked if he wanted to have sexual intercourse, his answer was yes.

Appellant and Morris did have sexual intercourse. Appellant maintains it was consensual; however, when, at trial, Morris was asked if she had wanted to have

4

intercourse with appellant, she responded, "No. I wanted to live." When appellant was finished, she pushed him away, grabbed her clothes, hurriedly left the room, and fled in a panic toward the hotel exit. She jumped down a flight of stairs, fell, and injured her right knee and her right hand. In fear and confusion, she could not find her bearings in that particular part of town and drove to a nearby small town where her parents lived and where she knew she would be safe.

She made it as far as Fritch and stopped at a convenience store to buy cigarettes. The convenience store clerk had known Morris for years and would not permit her to leave the store out of concern for the disheveled and disoriented Morris. When Morris told the clerk that she had been raped and was just trying to get to her mother, the clerk summoned local police, who directed Morris to return to Amarillo to be examined and report the matter to local authorities there. She was examined and evidence was gathered.

Officers from the Amarillo Police Department persuaded Morris to place a recorded phone call to appellant to confront him about the events of the late night and early morning of March 8–9, 2012, and see what, if anything, he would confess. During that recorded conversation, the following exchange occurred in which appellant did not deny the conduct and, instead, seemed to point to his overindulgence in alcohol as the a reason or excuse for his misconduct:

> Morris: Even if I was playing you, I have the right to die . . . . You have a right to kill me because I made you spend too much money on alcohol? Is that what you're telling me? This is your excuse here?

> Appellant: No, my excuse is that I had way too much to drink.

5

Morris: And when you have too much to drink you try to kill people?

Appellant: Usually, yes.

A Randall County jury found appellant guilty of aggravated assault and aggravated sexual assault and assessed punishment at twenty-five years' imprisonment for each offense. The trial court imposed judgment and sentence accordingly, and appellant has appealed those judgments. On appeal, he challenges the sufficiency of the evidence of certain elements of each offense. We will affirm both judgments.

## Standard of Review

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Id.* When reviewing all of the evidence under the *Jackson* standard of review, the ultimate question is whether the jury's finding of guilt was a rational finding. *See id.* at 906–07 n.26 (discussing Judge Cochran's dissenting opinion in *Watson v. State*, 204 S.W.3d 404, 448–50 (Tex. Crim. App. 2006), as outlining the proper application of a single

6

evidentiary standard of review). "[T]he reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* at 899.

## Aggravated Assault

Applicable Law

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1). An assault becomes aggravated if the actor commits assault and uses or exhibits a deadly weapon during commission of the assault. *See id.* § 22.02(a)(2). Again, appellant challenges only the sufficiency of the evidence showing that the instrument alleged—here, a knife—was a "deadly weapon." We need, then, to focus our review only on the evidence relevant to the character of the knife appellant used in his assault on Morris.

The Texas Penal Code defines a "[d]eadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B) (West Supp. 2014). We first observe that the State need not introduce the object into evidence for the trier of fact to find that such object was a deadly weapon. *See Morales v. State*, 633 S.W.2d 866, 868–69 (Tex. Crim. App. [Panel Op.] 1982); *see also Billey v. State*, 895 S.W.2d 417, 420 (Tex. App.—Amarillo 1995, pet. ref'd) (concluding that "the actual knife used in the commission of an offense need not be introduced into evidence if a witness is able to testify about the knife and the manner in which it was used"). Even without a description of the weapon, the victim's injuries can, by themselves, serve as a sufficient basis for the fact-finder to infer

7

that an appellant used a deadly weapon. *See Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008); *see also Morales*, 633 S.W.2d at 868–69 (concluding that photographic evidence of a deep slash requiring stitches and running from below victim's earlobe across her cheek to the corner of her mouth was sufficient to show that a deadly weapon was used).

In fact, regardless of whether any wounds were inflicted, a deadly weapon finding may be made if it is otherwise supported by the evidence. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); *Villarreal v. State*, 255 S.W.3d 205, 209 (Tex. App.—Waco 2008, no pet.). To determine whether a particular knife is a deadly weapon, courts consider the following factors: (1) the size, shape, and sharpness of the knife; (2) the manner of its use or intended use; (3) the nature or existence of inflicted wounds; (4) any testimony of the knife's life-threatening capabilities; and (5) words spoken by the accused. *See Thomas v. State*, 821 S.W.2d 616, 619 (Tex. Crim. App. 1991) (en banc); *Tisdale v. State*, 686 S.W.2d 110, 111 (Tex. Crim. App. 1984) (en banc). Both expert testimony and lay testimony may be independently sufficient to support a deadly weapon finding. *Banargent v. State*, 228 S.W.3d 393, 398–99 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). No one factor is determinative, and the fact-finder must examine each case on all of its facts to determine whether the instrument is a deadly weapon. *See Garcia v. State*, 17 S.W.3d 1, 4 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

<u>Analysis</u>

Both appellant and the State have represented that a knife was not introduced into evidence at trial. However, it appears from the record that a pocketknife taken from appellant at the time of his arrest *was* introduced at trial. Indeed, the exhibits volume of the reporter's record indicates that the State introduced as its Exhibit 25 a "black stainless steel pocketknife." Although we do not have the physical exhibit itself, the exhibits volume and the testimony surrounding the introduction of that exhibit suggest that a knife was, in fact, introduced into evidence at trial contrary to both appellant's and the State's representations in briefing. At the time the knife was introduced, Sergeant Richard Anderson of the APD testified, basing his conclusion on examination of the knife and his twenty-three years' experience with the APD, that the knife was "capable of causing serious bodily injury or death to another person." Even were we confronted with the record of a trial in which the alleged instrument was *not* introduced at trial, its absence would not be fatal to the State's case; here, sufficient evidence otherwise supports the jury's finding that appellant used a deadly weapon during the assault against Morris. *See Thomas*, 821 S.W.2d at 619; *Morales*, 633 S.W.2d at 868–69.

From Morris's account of the incident, appellant struck her, then held her down, and ultimately used the knife—in conjunction with the spiked brass knuckles he held near her left eye—to threaten her and coerce her into offering to have sexual intercourse with him in the hope of either appeasing or escaping him. Morris testified to a "burning" sensation as appellant moved the knife back and forth across her abdomen, called her names, told her repeatedly that she deserved to die, and threatened to "gut" her. Indeed, from Morris's perspective, it would have appeared that appellant had the

9

then-present intent and capacity to do just that to her. Certainly, appellant's use of the knife in such a manner lends itself in support of the jury's finding that appellant used or exhibited a deadly weapon during the commission of the assault on Morris.

Further, the record contains evidence depicting the injuries Morris sustained in the attack. The sexual assault nurse examiner observed the following injuries on Morris: redness to the corner of her left eyebrow and eye, a linear swollen area on her head, a three-centimeter linear abrasion on her left upper abdomen, and a four-centimeter curved abrasion on her right flank area, both of these abrasions being consistent with a knife wound. APD officers involved in the investigation noted similar observations. The jury was able to study and consider both photographic and testimonial evidence relating to those injuries, both the knife-inflicted and otherwise-inflicted injuries from the encounter, and was able to consider, too, the context in which those injuries were suffered. In conjunction with Anderson's testimony regarding the capacity of the knife to inflict serious bodily injury or death, the nature of the injuries Morris sustained and the context in which she sustained them lend further weight to the evidence showing that appellant used a deadly weapon during the commission of the assault on Morris. *See Thomas*, 821 S.W.2d at 619.

Based on the record evidence, the fact-finder could have reasonably found that appellant used a deadly weapon during his assault against Morris. *See Brooks*, 323 S.W.3d at 906–07. Accordingly, we overrule appellant's contention regarding the sufficiency of the evidence to sustain his conviction for aggravated assault.

## Aggravated Sexual Assault

From two directions, appellant challenges the evidence in support of his conviction for aggravated sexual assault. First, he contends that the evidence is insufficient to prove beyond a reasonable doubt that Morris did not consent to sexual intercourse. Second, much like he argued with respect to the knife in relation to the aggravated assault conviction, appellant again challenges the evidence that the knife used in the interaction was a deadly weapon, effectively contending that, even if the State could prove simple sexual assault, it failed to prove that said offense was aggravated. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(iv).

Applicable Law

A person commits the offense of aggravated sexual assault if (1) that person intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent and (2) that person uses or exhibits a deadly weapon in the course of the same criminal episode. *See id.* § 22.021(a)(1)(A)(i), (a)(2)(A)(iv). To "[c]onsent," within the meaning ascribed by the Texas Penal Code, is to "assent in fact, whether express or apparent." *Id.* § 1.07(a)(11). Section 22.021(c) incorporates by reference Section 22.011(b)'s fairly extensive list of circumstances in which the assault is considered "without consent" by statute. *Id.* § 22.021(c); *see id.* § 22.011(b) (West 2011) (criminalizing simple sexual assault). Here, the most pertinent of that list would characterize as nonconsensual a situation in which "the actor compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person

believes that the actor has the present ability to execute the threat." *See id.* § 22.011(b)(2).

<u>Analysis</u>

Lack of Consent

After pointing out what he perceives as inconsistencies between Morris's account of the incident and the physical evidence, primarily the SANE examination observations, appellant maintains that "[n]o rational trier of fact based on the totality of the evidence could find the evidence sufficient that Ms. Morris did not consent." The State responds to appellant's perceived inconsistencies by characterizing some of them as misrepresentations. For instance, appellant contends on appeal that Morris testified that she was hit on the head with the two-inch spikes of the brass knuckles that appellant wielded that night but exhibited no puncture wounds to her head that would be consistent with such a strike. The State points out that Morris did *not* testify that she was hit in the head with that particular side of the brass knuckles; rather, she testified that she was struck with the base or "bottom" side of the brass knuckles. That said, when the SANE examination showed that Morris had a raised and swollen linear injury to the back of her head, it was entirely consistent with Morris's account of the incident.

In his brief, appellant also points to evidence of conduct which he seemingly characterizes as suggestive of Morris's consent to the later intercourse. The State seems to concede that some of Morris's conduct that night may not have been in keeping with ladylike behavior but maintains that any misbehavior on her part does not equate to consent. Appellant points out that she voluntarily spent the day with him and

"even cooked a meal for him at her son's residence."  The record also suggests that Morris and appellant drank a great deal that evening.  Appellant also emphasizes Morris's dance at the bar during which she "gyrated around" suggestively as appellant sat in a chair, such that every man in the bar must have wished he could be appellant.  It was after this demonstration that the two went to appellant's hotel, and after appellant's persuasive efforts, ended up in his hotel room.  Appellant describes the sequence of events as follows: the two went up to the hotel room, he grabbed Morris and put her on the bed, she asked if he wanted to have sexual intercourse, he answered affirmatively, and the two engaged in intercourse per that discussion.  He omits any reference to spiked brass knuckles, a knife, or any alleged threat to "gut" her.

Morris testified that she offered to have intercourse only as a means of either appeasing or distracting appellant so that she might be able to escape the situation in which appellant had her pinned down and was threatening her life while wielding a knife and spiked brass knuckles.  At trial, she plainly denied wanting to have sexual intercourse with appellant and maintained that she only wanted to live.  The injuries she sustained as a direct consequence of her interaction with appellant were consistent with her characterization of the exchange and suggested that she was forced into the situation and did not freely consent to having sexual intercourse with appellant.  She also testified to her later efforts to escape appellant during which she sustained further injuries to her right knee and hand.  Jumping down a flight of stairs is conduct that would appear inconsistent with the account offered by appellant in which the two had engaged in consensual intercourse.

13

Again, per the Texas Penal Code, we must consider an assault nonconsensual if "the actor compels the other person to submit or participate by threatening to use force or violence against the other person and the other person believes that the actor has the present ability to execute the threat." *See id.* § 22.011(b)(2). Such is the scenario the record demonstrates here: Morris was forced to submit to intercourse with appellant when he restrained her and held her down while exhibiting weapons and threatening her life. In that circumstance, it is fair to say, and the record certainly supports, that intercourse, though perhaps offered by Morris's desperate invitation as an effort to save her life, was nonetheless nonconsensual on Morris's behalf. We overrule appellant's contention that the evidence was insufficient to show as much.

Deadly Weapon

Advancing similar contentions as he did with regard to his conviction for aggravated sexual assault, appellant maintains that the evidence was insufficient to prove that the knife allegedly used in the interaction was a deadly weapon. We reiterate that it appears to us that the State did introduce a pocketknife, which it presumably identified as the weapon used or exhibited during the assault. In light of the jury's ability to assess the characteristics and capacity of the knife, the APD officer's testimony that the knife was capable of causing serious bodily injury, the nature of the injuries to Morris, and the context in which those injuries were inflicted, we conclude that the evidence is sufficient to establish that appellant used or exhibited a deadly weapon during the sexual assault against Morris, making the sexual assault an aggravated offense. *See id.* § 22.021(a)(2)(A)(iv).

14

Accordingly, we overrule appellant's contention regarding the sufficiency of the evidence to support the finding that the knife he used in the incident was a deadly weapon with respect to his conviction for aggravated sexual assault as well.

Conclusion

Having overruled appellant's contentions on appeal, we affirm the trial court's judgments of conviction. *See* TEX. R. APP. P. 43.2(a).


Mackey K. Hancock
Justice


Do not publish.